## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DEREK M. ROGERS,**

       **Plaintiff,**

                                       **Civil Action 2:13-cv-461**

    **v.**                               **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

### OPINION AND ORDER

Plaintiff, Derek M. Rogers, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff Derek M. Rogers' Statement of Specific Errors (ECF No. 10), the Commissioner's Opposition to Statement of Errors (ECF No.13), Plaintiff Derek M. Rogers' Reply to Defendant's Memorandum in Opposition (ECF No. 14), and the administrative record (ECF No. 2). For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

### I.      BACKGROUND

Plaintiff filed his applications for disability and supplemental security income benefits on February 18, 2010, alleging that he has been disabled since August 1, 2009, at age 44. (R. at 122.) Plaintiff's application was denied initially and upon reconsideration. (R. at 9.) Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). (*Id.*) A hearing was

scheduled, but Plaintiff failed to appear and the case was dismissed.  (*Id.*)  Plaintiff appealed and produced proof that he was at a hospital at the time of the hearing.  (*Id.*)  The Appeals Council directed that Plaintiff receive a new hearing date.  (*Id.*)

Administrative Law Judge K. Michael Foley ("ALJ") held a hearing on January 24, 2012, where Plaintiff appeared *pro se* and testified.  (R. at 35-64.)  A vocational expert also appeared and testified.  (R. at 58-64.)  On February 14, 2012, the ALJ issued a decision finding that Plaintiff was not disabled.  (R at 9-22.)  The Appeals Council denied Plaintiff's request for review and adopted the ALJ's determination as final.  (R. at 1–4.)  Plaintiff then timely commenced this action.

## II.        HEARING TESTIMONY

At the January 24, 2012 hearing, the ALJ asked Plaintiff if he received papers informing him that he had a right to have counsel present at the hearing.  (R. at 38.)  Plaintiff initially said yes, but then indicated that he never saw anything informing him about the right to counsel's presence.  (*Id.*)  The ALJ asked Plaintiff if he wished to proceed or wanted more time to seek counsel.  (*Id.*)  Plaintiff stated that he would obtain counsel if there was an adverse ruling. (R. at 39.)  The ALJ advised Plaintiff that counsel's assistance would be most beneficial at the hearing stage and that it might be harder for Plaintiff to obtain counsel after an adverse ruling.  (*Id.*)  Plaintiff elected to proceed *pro se*.  (R. at 40.)  The ALJ then explained that he would be asking Plaintiff and vocational expert Lynn Kauffman questions about Plaintiff's case. (R. at 40–41.)  The ALJ also advised Plaintiff to inform him if he missed anything after he completed his questioning.  (R. at 41.)

### A.    Plaintiff's Testimony

Plaintiff testified that he finished a year and a half of college, obtained a certificate in telecommunications, and trained as a flight attendant with TWA.  (R. at 44.)  He further testified that after losing vision in his right eye, he trained at Goodwill Training Academy for computer and medical billing coding.  (*Id.*)  Plaintiff stated that at his last job in 2009, he worked as an office manager in a medical supply house processing and filling orders and doing occasional deliveries. (R. at 45–46.)  He left that job in 2009 because he had family obligations. (*Id.*)  Plaintiff indicated that he also previously worked as a medical records specialist at a doctor's office, at a Honda Plant in Marysville, as a security officer, as a TSA screener, and as a flight attendant.  (R. at 46–47.)

Plaintiff testified that his HIV status, loss of vision in in his right eye, and major depression prevented him from working.  (R. at 48.)  He stated that had "full capacity" in his left eye but the vision in his right eye was weak and he was unable to see "too much in it" if he took out his contact.  (*Id.*)  He agreed, however, that with his contact in he could see well enough to read print.  (R. at 48–49.)  He also told the ALJ that he had a driver's license but was restricted to daytime driving.  (*Id.*)  Plaintiff indicated that he drove once or twice a week around Columbus. (R. at 54.)

Plaintiff indicated that he was HIV positive but asymptomatic.  He further testified that when he was "really, really, stressed" it could cause his viral load to "shoot up," and that his viral load had been teetering for the last two or three years.  (R. at 49.)  He attributed his "teetering" viral load to the stress caused by caring for his mother who was very ill.  (*Id.*)  He further explained that the stress of caring for his mother had caused him to experience serious

mood swings and to feel like he did not want to be around people.  (*Id.*)  Plaintiff stated that he

"had no life outside [his] Mom."  (R. at 54).

Plaintiff testified that the stress of caring for his mother had gotten so bad that his doctor

had prescribed him antidepressants.  (R. at 49–50.)  Plaintiff stated that his medications made

him feel "disconnected" and moody.  (R. at 52.)  He told the ALJ that he had been taken off one

medication because it caused thoughts of suicide.  (*Id.*)  He further indicated that his medicines

caused sleep disruptions, but also indicated that his sleep disruptions were caused by "bad

nerves" and that he had always had "really bad nerves."  (R. at 53.)  He said that lately, his sleep

disruptions occurred almost every night.  (R. at 54.)  Plaintiff also testified that he began seeing

psychiatrist Rick Reed for his mental health issues approximately a month and a half before the

hearing.  (R. at 50.)

The ALJ asked Plaintiff about his functional capacities as follows:

Q: Mr. Rogers, do you have any particular problems with sitting?
A: No.
Q: Standing?
A: No.
Q: Walking?
A: No.
Q: Lifting?
A: No.
Q: Carrying?
A: No.

(R. at 53.)  Plaintiff also testified that he typically woke up around 6:30a.m. and went to bed

around 10:00p.m.  (R. at 55, 56.)  Plaintiff told the ALJ that he could bathe, shave, brush his

teeth, dress, and take care of his other personal needs without assistance.  (R. at 55.)  Plaintiff

indicated that he did the cooking and cleaning for himself and his mother.  (R. at 55.)  He also

indicated that he washed dishes, performed housecleaning, did laundry, and grocery shopped.

(R. at 55–56.) He mowed the lawn the summer before the hearing. (R. at 57.) Plaintiff also

stated that he attended church. (R. at 57.)

**B.     The Vocational Expert Testimony**

The ALJ posed several hypothetical questions to the VE. (R. at 59–61.) The ALJ first

asked the VE to consider an individual of Plaintiff's age and experience who had the following

capabilities and limitations:

> could occasionally lift and carry up to 50 pounds; frequently lift and carry up to
> 25 pounds; sit, stand, and walk for about six hours each workday, assuming
> normal breaks; . . . limited, as regards his vision, to occasional reading; and . . .
> can still do fine, precise work or prolonged visual work. Distant vision . . . would
> be impaired . . . should avoid concentrated exposure to hazards such as dangerous,
> moving machinery, unprotected heights, and the like.

(R. at 61.) Based on this hypothetical, the VE testified that Plaintiff could return to some of his

past work, including flight attendant, security guard, TSA screener, and the delivery portion of

his work at a medical supply company. (*Id.*) The ALJ then asked the VE to consider someone

who was additionally restricted in that he could maintain concentration, persistence, and pace

and relate to others in a relaxed work environment, but should not be expected to handle frequent

changes, conflict, or a fast-paced work environment. (R. at 62.) The VE testified that this

eliminated Plaintiff's past relevant work except for the delivery portion of Plaintiff's work at the

medical supply company. (*Id.*) The ALJ determined that the delivery work could not be parsed

out from the other work performed in that position. (*Id.*) The ALJ therefore asked if other

unskilled jobs existed that could be performed by someone with these same restrictions. (*Id.*)

The VE testified that there were other unskilled jobs at the medium exertion level that Plaintiff

could perform, including cleaner and hand packer, and that there were 5,000 and 2,500 such jobs

in the national and local economies respectively. (R. at 62.) The VE further testified that other

unskilled jobs existed at the light exertion level that Plaintiff could perform including cleaner and

sorter, and that there were 5,000 and 1,000 such jobs in the national and local economies respectively.  (R. at 62.)

Plaintiff indicated that nothing in the VE's testimony was unclear.  (R. at 63.)  Plaintiff did not cross examine the VE.

### III.    MEDICAL RECORDS

**A.    Plaintiff's Physical Impairments: Vision and HIV**

**1.    OSU Optometry Services**

The record contains a September 6, 2011 prescription from OSU Optometry Services for a left contact.  (R. at 258.)

**2.    Joseph T. Baker, M.D., Whitman Walker Clinic**

The record contains an August 28, 2009 Physician Certification form filled out by Dr. Joseph Baker at the Whitman Walker Clinic in Washington, D.C.  (R. at 202.)  That form is used by persons seeking to have their student loan debts discharged because of a total and permanent disability.  (*Id.*)  Dr. Baker indicated on the form that Plaintiff had a disabling condition that prevented him from working.  (*Id.*)  Specifically, Plaintiff had HIV and associated fatigue, muscle weakness, mild neuropathy, and depression.  (*Id.*)  Dr. Baker also wrote that Plaintiff was on antiviral drugs but his symptoms persisted.  (*Id.*)  Dr. Baker opined that Plaintiff should not lift more than 10 pounds, and that he could not sit, stand, or walk for more than thirty minutes.  (*Id.*)  Dr. Baker indicated that because of these restrictions, Plaintiff had difficulties completing activities of daily living.  (*Id.*)

**3.    Rachel L. Demita, M.D., Cramblett Infectious Disease Clinic**

On January 28, 2010, Plaintiff saw Dr. Demita at the Cramblett Infectious Disease Clinic in Columbus, Ohio.  Dr. Demita noted that Plaintiff had been HIV positive since 1983.  (R. at

243.) Dr. Demita also noted that Plaintiff was previously treated at the Cramblett Clinic in July of 2008 before he moved to Washington D.C. (*Id.*) Plaintiff told Dr. Demita that he had recently moved back to Columbus from D.C. because his mother was ill. (*Id.*) Plaintiff also told Dr. Demita that he was seen by an infectious disease physician in D.C. who regularly followed Plaintiff's CD4 counts and viral loads. (*Id.*) Plaintiff's last CD4 count was 750 and his last viral load was undetectable. (*Id.*) Plaintiff stated that he had been treated for latent syphilis while in D.C. (*Id.*) Plaintiff reported taking Atripla for HIV since 2007 but he had run out of it a week earlier. (*Id.*) He described having strange dreams when he began taking Atripla, but noted that those had dissipated. (*Id.*) Plaintiff stated that overall, he felt well physically, but he was going through some tough times mentally with his mother being ill. (*Id.*) Plaintiff also reported blurred vision. (*Id.*) Dr. Demita gave Plaintiff a prescription for Atripla, ordered blood work, and recommended a follow up appointment in three months. (*Id.*)

### 4. Julian J. Goodman, M.D., Ohio State University Hospital Infectious Disease Clinic

The record contains treatment notes from five visits with Dr. Julian Goodman at the Ohio State University Hospital Infectious Disease Clinic ("OSU"). At his first visit, Plaintiff told Dr. Goodman that his chief compliant was depression. (R. at 273.) Plaintiff's HIV status is, however, reflected in these records as well. For instance, on August 5, 2010, Dr. Goodman wrote: "HIV – [d]oing well; will continue Atripla for now." (R. 275.) Similarly, on October 7, 2010, Dr. Goodman wrote that Plaintiff's HIV was doing well. (R. at 269.) That same day, Dr. Susan Kolesar at OSU independently examined Plaintiff and agreed with Dr. Goodman's assessments. (R. at 228.) She wrote that Plaintiff "was doing well from an HIV standpoint." (*Id.*) On December 9, 2010, Plaintiff was treated for chlamydia, a UTI, and epididymis. (R. at 265.) At that time, Dr. Goodman again wrote that Plaintiff's HIV was controlled. (R. at 267.)

On April 4, 2011, Dr. Goodman wrote that Plaintiff reported a lump on the right side of his neck that had gotten bigger over the last several months. (R. at 263.) Plaintiff, however, reported no fevers, chills, sweats, or weight loss. (*Id.*) Plaintiff complained of headaches that had gone on for six weeks on the right side of his head; he attributed them to the Atripla he was taking for HIV. (*Id.*) Dr. Goodman opined that it was not likely that the headaches were caused by the Atripla, but thought they were related instead to Plaintiff's recent dental procedures. (*Id.*) Dr. Goodman further opined that the neck swelling might also be related to Plaintiff's dental work. (R. at 265.) Dr. Goodman nevertheless wrote that Plaintiff's HIV continued to be controlled. (R. at 265.)

On June 16, 2011, Plaintiff told Dr. Goodman that he was "falling apart." (R. at 260.) He reported having daily migraines for the past few weeks that lasted for a few hours and were accompanied by nausea. (*Id.*) He also reported burning around his rectum that had started several months ago and then disappeared before returning. (*Id.*) Dr. Goodman opined that Plaintiff's headaches might be due to underlying stressors and recommended that Plaintiff go back to his counselor for his depression. (R. at 262.) Plaintiff also complained that over the past few days he had experienced chest pains, tightness in his chest, and palpitations. (R. at 260.) Dr. Goodman ordered an EKG and a cardiogram for Plaintiff's chest pain. (R. at 262.) Dr. Goodman nevertheless opined again that Plaintiff's HIV was "[d]oing well; suppressed and controlled." (*Id.*)

Lab results from June 16, 2011, revealed that Plaintiff's aorta was markedly abnormal. (R. at 259.) Plaintiff's doctors ordered a CT aneurysm study and told Plaintiff to report to the emergency room if his chest pain worsened. (*Id.*) Plaintiff called the medical center the next

day and reported worsening chest pain.  (*Id.*)  Plaintiff went to the Ohio State University

Emergency Department where he was kept overnight for observation.  (*Id.*)

### 5. Evaluating Physician, Kathleen A. McGowan, M.D.

On June 17, 2010, Dr. McGowan performed a consultative opthamalogical/optometric

examination of Plaintiff.  (R. at 215–18.)  In her report, Dr. McGowan wrote that Plaintiff

underwent two repairs to his right eye after a retinal detachment in 2006.  (R. at 215.)  Dr.

McGowan also wrote that Plaintiff wore a soft contact in his right eye.  (*Id.*)  With the contact in,

Plaintiff's distance vision in his right eye was 20/300, and his reading vision in that eye was

20/800 at fourteen inches.  (*Id.*)  Dr. McGowan noted that both eyes appeared clear but the right

eye had a trace posterior cortical cataract.  (*Id.*)  She further noted that Plaintiff's results on a

plotted field test suggested that Plaintiff was malingering.  (R. at 216.)  Specifically, Plaintiff's

right visual field was inconsistent with his subjective responses.  (*Id.*)  Dr. McGowan opined that

Plaintiff's reduced visual acuity in his right eye would reduce his fine depth perception and

probably reduced his peripheral vision, but she could not quantify this because of Plaintiff's

inconsistent test responses.  (*Id.*)  She further opined that Plaintiff could drive but that he should

not work at heights.  (*Id.*)

### 6. Reviewing Physicians, W. Jerry McCloud, M.D. and Teresita Cruz, M.D.

On July 2, 2010, state-agency physician Dr. W. Jerry McCloud reviewed Plaintiff's file

and assessed Plaintiff's physical functional capacity.  (R. at 219–26.)  Dr. McCloud found that

Plaintiff had some visual and environmental limitations.  (R. at 22–23.)  Specifically, based upon

Dr. McGowan's examination, Dr. McCloud concluded that Plaintiff's near acuity, far acuity, and

depth perception were limited.  (R. at 222.)  Because of this poor vision, Dr. McCloud opined

that Plaintiff should avoid concentrated exposure to hazards such as hazardous machinery,

heights, and commercial driving. (R. at 223.) Plaintiff's vision was, however, sufficient for occasional reading and very fine, precise work or prolonged visual work. (R. at 222.)

Dr. McCloud also determined that Plaintiff could occasionally lift or carry up to 50 pounds, frequently lift or carry up to 20 pounds, and that Plaintiff had no limitations for pushing and pulling aside from these weight restrictions. (R. at 220.) Dr. McCloud further determined that Plaintiff could stand, walk, or sit for about six hours in an eight-hour work day. (*Id.*) Dr. McCloud noted that in August 2009, Dr. Baker at the Whitman Walker Center in Washington D.C. had opined that Plaintiff was more restricted with regards to lifting and sitting and that Plaintiff had difficulties with activities of daily living. (R. at 225.) Specifically, Dr. Baker had opined that Plaintiff should not lift more than 10 pounds, and that he could not sit, stand, or walk for more than thirty minutes. (R. at 202.) Dr. McCloud concluded that Dr. Baker's opinion was not supported by Plaintiff's statements and the physical done at OSU by Dr. Goodman in January of 2010. (R. at 225.) On October 25, 2010, state agency physician Dr. Terisita Cruz reviewed the file and affirmed Dr. McCloud's assessment. (R. at 237.) Dr. Cruz further noted that HIV blood tests done by OSU showed that Plaintiff's blood counts had improved in September of 2010. (*Id.*)

## B.      Plaintiff's Mental Impairments: Depression

### 1.      Joseph T. Baker, M.D.

In the August 28, 2009 Physician Certification form used to discharge student loan obligations, Dr. Baker opined that Plaintiff had social anxiety with resultant major depression. (R. at 202.) In the space where Dr. Baker was asked to assign Plaintiff a GAF score, Dr. Baker wrote "Major Depression." (*Id.*)

### 2. Rachel L. Demita, M.D., Cramblett Infectious Disease Clinic

The treatment record from Dr. Demita also reflects the status of Plaintiff's depression. Specifically, on January 28, 2010, Plaintiff told Dr. Demita that overall, he felt well physically, but he was going through some tough times mentally with his mother being ill. (R. at 243.)  Dr. Demita noted that Plaintiff had no suicidal or homicidal ideations and that Plaintiff's memory, affect, and judgment appeared normal.  (R. at 243–44.)

### 3. Julian J. Goodman, M.D., Ohio State Medical Center

As noted, on August 5, 2010, Plaintiff told Dr. Goodman that his chief complaint was depression.  (R. at 273.)  Plaintiff stated that he had been depressed for the past couple years and that his depression had recently increased.  (*Id.*)  He also reported that he was stressed about his mother and worried that changes to the Ohio HIV Drug Assistance Program might cause him to lose benefits.  (*Id.*)  Plaintiff described "ongoing crazy dreams" from the Atripla he was taking for HIV.  (*Id.*)  He also told Dr. Goodman that he was participating in a play in an attempt to "get away."  (*Id.*)  Plaintiff scored 19 on a Patient Health Questionnaire administered by Dr. Goodman, which indicated that Plaintiff likely had major depression that was "moderately severe."  (*Id.*)  Dr. Goodman wrote in his assessment: "Depression – discussed [one of Plaintiff's medications] as a potential component; [Plaintiff] feels as though he has been depressed even prior to starting this and that this relates to his current situation."  (R. at 275.)  Dr. Goodman prescribed Celexa, an antidepressant, and recommended a follow-up visit in one month.  (*Id.*)

On August 30, 2010, Plaintiff called the medical center and reported that Celexa gave him headaches.  (R. at 272.)  Plaintiff was switched from Celexa to Zoloft.  (*Id.*)  On September 2, 2010, Plaintiff told Dr. Goodman that his headaches stopped when he ceased using Celexa but returned when he started taking Zoloft.  (R. at 270.)  Plaintiff described his headaches as

"constant throbbing." (*Id.*)  Plaintiff reported that his mood was still down and that stopping his medications increased his depression a little bit.  (*Id.*)  Plaintiff also reported poor appetite and sleep, but no suicidal ideations.  (*Id.*)  Plaintiff stated that he had been doing a lot of "involved dancing" to get ready for a show in which he was performing.  (*Id.*)  Dr. Goodman wrote that Plaintiff's mood was "much improved," his affect was normal, and that Plaintiff was laughing and joking.  (R at 271.)  Dr. Goodman referred Plaintiff to psychiatry because of his medication intolerances.  (*Id.*)

On October 7, 2010, Plaintiff told Dr. Goodman he still had poor appetite and sleep.  (R. at 268.)  He thought that one of his medications may have been giving him headaches.  (*Id.*)  Plaintiff was still concerned about his mother's health and that his siblings were not helping.  (*Id.*)  Plaintiff told Dr. Goodman that he did not have a life outside his Mom.  (*Id.*)  Plaintiff cried at times when talking about his mother, but his affect was appropriate.  (R. at 269.)  Plaintiff also told Dr. Goodman that he was in a show the previous weekend, it was "incredible," and that he planned to go to Cincinnati at the end of the month with the show.  (R. at 268.)  Dr. Goodman noted that Plaintiff's depression was "[l]ikely due to more underlying psychosocial issues than organic depression."  (R. at 269.)  Dr. Susan Kolesar independently examined Plaintiff and agreed with Dr. Goodman's assessments.  (R. at 228.)  She wrote that Plaintiff was "dealing with a lot of social/family issues that are resulting in situational depression."  (*Id.*)  Dr. Kolesar noted that Plaintiff reported discontinuing his antidepressants because he did not like how they made him feel.  (*Id.*)  He also reported deriving benefits from counseling.  (*Id.*)

On December 9, 2010, Dr. Goodman noted that Plaintiff still had "significant depression" and was continuing to see his therapist.  (R. at 265.)  Plaintiff reported that his mood had worsened as a result of a recent bout with chlamydia, a UTI, and epididymis.  (*Id.*)  Plaintiff had

not yet seen a psychiatrist. (*Id.*) Plaintiff admitted to Dr. Goodman that he had thoughts about being "better off" if he were no longer alive, but he denied being suicidal. (Rec. at 265–66.) Dr. Goodman recommended that Plaintiff continue with therapy and try to see a psychiatrist. (R. at 267.) He also directed Plaintiff to go to the emergency room if he had any suicidal ideations. (*Id.*)

On April 4, 2011, Dr. Goodman noted that Plaintiff's mood was doing somewhat better but that Plaintiff still had stressors at home and was still crying sometimes. (R. at 263.) Similarly, on June 16, 2011, Dr. Goodman wrote that Plaintiff's overall mood was not great, and that Plaintiff had "lots of stress with his mother; more than usual." (*Id.*) Plaintiff stated that he needed to get away from his mother for a little bit, but he didn't want her to die. (*Id.*) Plaintiff's appetite and sleep were poor but he had no suicidal ideations. (*Id.*) Dr. Goodman wrote, "[w]hile complaining he is smiling and does not appear to be distressed." (*Id.*) He also noted that Plaintiff's affect was somewhat blunted. (R. at 261.)

### 4. Sandra Forti, Ph.D

On December 2, 2010, Psychologist Sandra Forti filled out a questionnaire about Plaintiff's mental health issues. (R. at 239–41.) Dr. Forti stated that she first saw Plaintiff on September 1, 2010. (R. at 239.) Plaintiff presented as "charming, anxious, and depressed secondary to life circumstances of unemployment and living with his mother who is demanding and controlling, and HIV/health status." (R. at 240.) Dr. Forti indicated with regard to intellectual limitations, Plaintiff's only cognitive limitation was concentration, which was limited because of his depression and anxiety. (*Id.*) With regard to social interactions, Dr. Forti indicated that Plaintiff had difficulties with immediate family members, a hard time setting boundaries, and was "taken advantage of." (*Id.*) She further indicated that Plaintiff was pleasant

and appropriate with brief encounters with the public but had poor tolerance for frustration.  (*Id.*)
Forti wrote that she did not know about Plaintiff's ability to tolerate routine daily or workplace
stressors.  (R. at 241.)  She also wrote that Plaintiff had no observed restrictions in his activities
of daily living.  (R. at 240.)  Plaintiff had marked anhedonia, poor appetite, and poor sleep.  (*Id.*)
This condition had become chronic and his symptoms were present when family entanglements
escalated or Plaintiff had a relationship loss.  (R. at 241.)  Dr. Forti noted that Plaintiff was
making "a lot of effort" in treatment, but he had life circumstances that kept him "mired in
depression and anxiety."  (*Id.*)  Dr. Forti diagnosed Plaintiff with major depressive disorder. (*Id.*)

### 5. Evaluating Physician, James C. Tanley, Ph.D.

On May 13, 2010, state agency psychologist James Tanley consultatively evaluated
Plaintiff and assessed his mental functional capacities.  (R. at 203–05.)  Plaintiff told Dr. Tanley
that he had been HIV positive for 27 years but that he had recently become depressed.  (R. at
203.)  When asked about his depression, Plaintiff stated that he could "just break out in tears the
last two years," he did not like being around others, and he felt "evil sometimes."  (*Id.*)  Plaintiff
also told Dr. Tanley that he had never seen a psychologist before.  (*Id.*)  Dr. Tanley could not
elicit other substantive information from Plaintiff about his depression.  (*Id.*)

Dr. Tanley noted that Plaintiff was clad in clean and casual attire.  (R. at 204.)  Plaintiff
was cooperative and exhibited no eccentricities in his manner, impulsivity, or compulsivity.  (*Id.*)
Plaintiff understood the purpose of the examination and did not appear to exaggerate symptoms.
(*Id.*)  Plaintiff's rate and volume of speech were adequate.  (*Id.*)  Plaintiff's thoughts were
coherent, relevant, and goal oriented.  (*Id.*)  Plaintiff's affect was appropriate and his eye contact
was good.  (*Id.*)  Plaintiff complained that his appetite and sleep were bad and that he had mood
problems.  (*Id.*)  He did not cry during the examination or show signs of anxiety or abnormal

mental content.  (*Id.*)  Plaintiff was alert, fully oriented, and his memory was intact.  (*Id.*)  His intellectual functioning appeared to be no higher than low average.  (*Id.*)  Plaintiff's judgment was sufficient.  (*Id.*)  Plaintiff reported that his daily routine consisted of getting up around 6:45am, doing cooking and other things for his mother, and performing household chores.  (*Id.*)  Plaintiff stated that he enjoyed singing, and that he occasionally read.  (*Id.*)  He went to bed between 10:30 p.m. to midnight.  (*Id.*)

Dr. Tanley diagnosed Plaintiff with adjustment disorder with chronic depressed mood.  (R. at 205.)  Dr. Tanley opined that Plaintiff's GAF score for his symptoms was 60.[1]  (*Id.*)  Plaintiff had no limitations relating to others, understanding and following simple instructions, or with concentration, persistence, and pace.  (*Id.*)  On the other hand, Plaintiff's appetite, sleep disturbances, and mood problems moderately impaired his ability to withstand the stress and pressure of daily work.  (*Id.*)

### 6.    Reviewing Physicians, John Waddell, Ph.D., and Bonnie Katz, Ph.D.

On May 27, 2010, state agency psychologist Dr. John Waddell reviewed Plaintiff's file and assessed his mental capacities.  (R. at 211–13.)  In Section I of his report, Dr. Waddell noted that Plaintiff was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (R. at 211.)  Dr. Waddell further noted in Section I of his report that Plaintiff was moderately limited in his ability to complete a normal workday and work week without interruptions from his psychologically

---

[1] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of  51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV-TR at 34.

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 212.) Dr. Waddell wrote a narrative assessment in Section III of his report that included work-related restrictions. Specifically, in Section III, Dr. Waddell opined that Plaintiff retained the ability to understand and complete a variety of tasks and to maintain concentration, persistence, and pace to perform such tasks and relate to others in a relaxed work environment. (R. at 213.) He opined that Plaintiff should not, however, be expected to handle frequent changes, conflict, or a fast-paced work environment. (*Id.*) On December 1, 2010, state agency reviewing psychologist Dr. Bonnie Katz reviewed Plaintiff's file and affirmed Dr. Waddell's assessment. (R. at 238.)

## IV.    THE ADMINISTRATIVE DECISION

On February 14, 2012, the ALJ issued a final decision. (R. at 9– 22.) The ALJ found that Plaintiff had the following severe impairments: an asymptomatic HIV infection, diminished vision in his right eye, and depression. (R. at 12.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (*Id.*) The ALJ set forth Plaintiff's residual functional capacity ("RFC") in the written determination as follows:

> After careful consideration of the entire record, I find that [Plaintiff] has the residual functional capacity to perform a full range of wok at all exertional levels . . . with the following . . . limitations: [Plaintiff] is  moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  He is moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. [citation to Dr. Waddell's May 2010 Report].

(R. at 13.)  These mental restrictions reflect capacity findings contained in Section I of Dr. Waddell's May 2010 report.  They do not, however, reflect the work-related restrictions

contained in Section III of that same report.  (R. at 211–14.)  Nor do they reflect the physical

restrictions in Dr. McCloud's July 2010 report.  (R. at 219–226.)  The ALJ nonetheless asked the

VE to contemplate the mental restrictions from Section III of Dr. Waddell's report and the

physical restrictions contained in Dr. McCloud's report when the VE formulated his testimony.

Specifically, the ALJ asked the VE to consider someone who:

> could occasionally lift and carry up to 50 pounds; frequently lift and carry up to
> 25 pounds; sit, stand, and walk for about six hours each workday, assuming
> normal breaks; . . . limited, as regards his vision, to occasional reading; and . . .
> can still do fine, precise work or prolonged visual work. Distant vision . . . would
> be impaired . . . should avoid concentrated exposure to hazards such as dangerous,
> moving machinery, unprotected heights, and the like . . .
>
> [and] who was additionally restricted in that he could maintain concentration,
> persistence, and pace and relate to others in a relaxed work environment, but
> should not be expected to handle frequent changes, conflict, or a fast-paced work
> environment.

(R. at 61–62.)  The ALJ then relied upon the VE's testimony to conclude that Plaintiff was

unable to perform any of his past relevant work but that he could perform jobs that existed in

significant numbers in the local and national economies.  (R. at 16–17.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  LEGAL ANALYSIS

Plaintiff raises several assignments of errors. First, Plaintiff asserts that the ALJ failed to properly assess medical opinion evidence. Plaintiff also asserts that the ALJ relied on flawed VE testimony. Finally, Plaintiff asserts that the ALJ failed to fully develop the record by asking Plaintiff more probing questions about his physical functional capacities at the hearing. These purported errors will be addressed in turn.

A.      **The ALJ Properly Assessed Medical Opinion Evidence**

Plaintiff asserts that the ALJ failed to properly assess medical opinions from Drs. Forti, Tanley, and Waddell regarding Plaintiff's mental impairments, and opinions from Drs. Baker, McCloud, and McGowan regarding Plaintiff's physical impairments. The Court disagrees.

As a preliminary matter, the Court notes that the ALJ erred by setting forth the wrong restrictions in his written residual functional capacity determination. Specifically, the ALJ set forth capacity findings from Section I of Dr. Waddell's May 2010 report in the written determination. The ALJ appears to have intended, however, to adopt the work-related mental restrictions set forth in Section III of Dr. Waddell's report and the physical restrictions contained in Dr. McCloud's July 2010 report. This intention is apparent because the ALJ used the work-related restrictions in Section III of Dr. Waddell's report and restrictions in Dr. McCloud's report in his hypothetical questions to the VE. (R. at 61–62.) The ALJ then relied upon the VE's testimony to reach his ultimate finding of non-disability. (R. at 16–17.) Although including those restrictions in the residual functional capacity finding in the written determination would have made the determination clearer, it would not have changed the outcome. Plaintiff thus cannot demonstrate that he has been prejudiced or harmed by the ALJ's failure to include them in the written determination. *Accord Shineski v. Sanders,* 556 U.S. 396, 409 (2009) (explaining that the party challenging an agency action must normally show that agency error is harmful). As is also apparent from the discussion below, this failure forms the basis of many of Plaintiff's statements of errors regarding the ALJ's assessment of medical opinion evidence.

1.      **Opinion Evidence Regarding Plaintiff's Mental Impairments**

a.      **Dr. Forti**

The ALJ did not discuss Dr. Forti's opinions.  Plaintiff argues that this is error.  Plaintiff also asserts that Dr. Forti saw Plaintiff on at least two occasions and that Dr. Forti might therefore have been treating physician.  Plaintiff argues that the ALJ erred by not making that determination and proceeding accordingly.  The Court disagrees.  The ALJ's hypothetical question to the VE is consistent with Dr. Forti's opinion and the ALJ relied upon the VE's response to that question.

An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  The regulations further provide that the ALJ must consider several factors when determining what weight to give each medical opinion, including, but not limited to, the examining relationship, the treatment relationship, supportability, consistency, and specialization ("the regulatory factors").  *Nelson v. Comm'r of Soc. Sec.*, No. 05-5879, 2006 WL 2472910, at *7 (6th Cir. Aug. 28, 2006) (summarizing 20 C.F.R. §§ 404.1527 and 416.927).

With regard to the second factor, treating relationship, special consideration is given to opinions from treating sources.  A treating source is a doctor or other acceptable medical source that provides medical treatment or evaluation in the context of an ongoing relationship.  20 C.F.R. §416.902.   The regulations further provide that an ongoing relationship can be established after only a few or infrequent visits if that would be typical of treatment for a medical

condition. *Id.* Medical opinions from a treating source are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and they are not inconsistent with the other substantial evidence in the case record. *Nelson,* 2006 WL 2472910, at *7.

If an ALJ does not give a treating source's opinion controlling weight, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, when a treating source's opinion is not given controlling weight:

> [a]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Regulations also provide that an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). An ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has explained the rationale behind the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F3d at 544–55.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

In *Wilson*, the Sixth Circuit nevertheless held that there are at least three harmless error exceptions to the good-reason requirement.  378 F.3d 547.  First, harmless error may occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it."  *Id.*  Second, harmless may occur when an ALJ's determination is consistent with a medical opinion, which makes weighing that opinion, and explaining its weight, irrelevant.  *Id.*  Finally, harmless error may occur when the goal of the good reason rule is met and a claimant can understand why his or her treating physicians' opinions have been discounted even in the absence of a specific explanation.  *Id.*

The ALJ did not determine if Dr. Forti was a treating physician. This Court need not make this determination either.  In this case, the failure to determine whether Dr. Forti was a treating physician—and the Court has considerable doubt whether two visits would render her a treating physician—does not constitute reversible error because the ALJ's functional capacity determination was consistent with Dr. Forti's opinion.  Dr. Forti wrote that she was unaware of any significant restrictions in Plaintiff's activities of daily living.  (R. at 240.)  She was also unaware of Plaintiff's ability to tolerate routine daily stress or work-place stressors.  (R. at 241.)  Indeed, Dr. Forti only identified two restrictions.  Dr. Forti opined that with regard to cognitive status, Plaintiff had "no noted cognitive limitations other than poor concentration due to depression and anxiety."  (R. at 240.)  With regard to social interactions, Plaintiff was "pleasant and appropriate with brief encounters with the public but [had] poor tolerance for stress."  (R. at 240.)  But the ALJ accounted for both of these restrictions in his hypothetical question to the VE.

Specifically, the ALJ asked the VE to contemplate someone who could maintain concentration, persistence, and pace and relate to others in a relaxed work environment, but should not be expected to handle frequent changes, conflict, or a fast-paced work environment.   (R. at 62.)

As noted above, the ALJ did not include these restrictions in the written functional capacity determination.  (R. at 13.)  The ALJ's hypothetical question nonetheless used those restrictions and the ALJ relied upon the VE's responses to those questions.  Pursuant to *Wilson*, when an ALJ's determination is consistent with a medical opinion, weighing and explaining the weight of the opinion is unnecessary, even if the opinion is from a treating source.  *See Wilson*, 378 F.3d 547.  Moreover, if Dr. Forti was not a treating physician, Plaintiff can show no harm. The ALJ accommodated Dr. Forti's restrictions when questioning the VE.  No other medical opinion included more limited restrictions in these domains.  Indeed, Dr. Tanley actually opined that Plaintiff had no limitations in these two domains.  (R. at 205.)

**b.     Dr. Tanley**

Plaintiff asserts that the ALJ "mentioned" Dr. Tanley's opinion but erred by failing to weight it.  The Court disagrees.

Dr. Tanley consultatively examined Plaintiff.  SSR 96-6p requires an ALJ to consider opinions from consulting and reviewing sources.  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180 at *1 (Soc. Sec. Admin. July 2, 1996).  Factors to be used when assessing such opinions include the examining relationship, the treatment relationship, supportability, consistency, and specialization.  *Id.*  Nonetheless, the analysis of a consulting and examining source's opinion is not required to be as detailed as the analysis of a treating source's opinion.  *See Allen v. Colvin*, No. 2:12-cv-619, 2013 WL 5274577, at * 4 (S.D. Ohio, Sept. 18, 2013).  Moreover, as between consulting and reviewing opinions, an ALJ is generally required to give more weight to an

opinion from the former than the latter.  20 C.F.R. § 404.1527(c), (c)(1).  However, there is no requirement that an ALJ specifically label the amount of weight that these opinions receive.  Nor is there a "good-reason" requirement for such sources.  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).

Contrary to Plaintiff's assertion, the ALJ did not merely mention Dr. Tanley's opinion. Rather, the ALJ extensively reviewed it and wrote:

> [Plaintiff] was examined consultatively by James Tanley, Ph.D. on May 13, 2010. That psychologist noted that [Plaintiff] said he had been HIV positive for some 27 years and that he recently had been getting depressed. He said that he had a poor appetite (he is six feet tall and weighed 182 pounds), he did not sleep well, and he had mood problems. Intellectual functioning appeared no higher than Low Average. He had never seen a psychologist. He left his job in D.C. two years earlier to return to Ohio and care for his mother, who is ill.
>
> [Plaintiff] cooks for himself and his mother, performs household chores, does yard work, likes to sign, and reads every so often. He does not care for television. He could understand, remember, and carry out simple, routine tasks both at home and in the community. He could concentrate, persist, and maintain pace to perform simple repetitive tasks . . .
>
> Dr. Tanley diagnosed a chronic adjustment disorder with depressed mood.  On the GAF, he rated the claimant's symptom severity at 60 and his functional severity at 85 . . .   a GAF in the rage of 51-60 indicates *moderate* symptoms or moderate difficulty in social, occupational, or school functioning . . .   A score in the range of 81-90 indicates absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities socially effective, generally satisfied with life, and with no more than everyday problems or concerns (e.g., an occasional argument with family members) . . .

(R. at 14.)  Moreover, Dr. Tanley opined that Plaintiff was unimpaired in his ability to understand and follow simple instructions, to relate to others, and in concentration, persistence, and pace.  (R. at 205.)

On the other hand, the ALJ asked the VE to contemplate a person who was able to maintain concentration, persistence, and pace and relate to others in a relaxed work environment.

(R. at 62.)  Accordingly, the ALJ used a hypothetical question with the VE that included limitations in the ability to relate to others even though Dr. Tanley opined that Plaintiff had no limitations in that domain.  In addition, Dr. Tanley opined that Plaintiff was moderately impaired in his ability to withstand the stress and pressure of daily work.  (*Id.*)  The ALJ accounted for that limitation by asking the VE to contemplate a person who should not be expected to handle frequent changes, conflict, or a fast-paced work environment.  (R. at 62.)  The ALJ then relied upon the VE's testimony.  The ALJ did not err in considering and analyzing Dr. Tanley's opinion.

### c.  Dr. Waddell

Plaintiff also asserts that although the ALJ "mentioned" Dr. Waddell's opinion, he failed to properly weight it.  The Court disagrees.

Dr. Waddell reviewed Plaintiff's file.  SSR 96-6p therefore also governs how the ALJ was to assess this opinion.  1996 WL 374180 at *1.  Although the ALJ was required to consider the examining relationship, the treatment relationship, supportability, consistency, and specialization when assessing Dr. Waddell's opinion, the ALJ was not required to specifically label the amount of weight assigned to this opinion.  *See id.*  Nor is there a "good-reason" requirement for opinions from reviewing sources.  *See Smith*, 482 F.3d at 876.

In Section III of his report, Dr. Waddell opined that Plaintiff retained the ability to understand and complete a variety of tasks and to maintain concentration, persistence, and pace to perform such tasks and relate to others in a relaxed work environment.  (R. at 213.)  He further opined that Plaintiff should not be expected to handle frequent changes, conflict, or a fast-paced work environment.  (*Id.*)  As explained above, the ALJ did not include these mental limitations in his written residual functional capacity determination.  (R. at 13.)  Yet the ALJ used these

exact limitations in the hypothetical question posed to the VE.  (R. at 62, 213.)  Indeed, the ALJ handed the VE a copy of Dr. Waddell's report and explicitly referred to the limitations set forth in narrative form in Section III of that document.  (R. at 61–62.)  In the written determination, the ALJ also stated that based in part upon the mental limitations contained in Dr. Waddell's report, the VE testified that Plaintiff could not perform any of his past relevant work.  (R. at 16.)  The ALJ then relied upon that testimony.  Accordingly, the ALJ adopted Dr. Waddell's opinion as to Plaintiff's mental functional capacities.  Substantial evidence supports this determination.  Although Plaintiff complained of depression and stress, the record evidence suggests these conditions were situational.  Plaintiff suffered from depression, stress, and mood issues when caring for his mother who was ill and after he contracted chlamydia, a UTI, and epididymis.  (R. at 228, 243, 240, 260, 263, 265, 269.)  And despite these issues, medical providers reported that Plaintiff's mood and affect were good and appropriate.  (R. at 204, 243–44, 260, 268, 271.)  Plaintiff also dealt with stress by dancing and performing in a show.  (R. at 270, 273, 268.)  Accordingly, the record evidence supports the ALJ's use of the light limitations in Dr. Waddell's report when examining the VE.  Moreover, although it would have been clearer if the ALJ had set forth Dr. Waddell's restrictions in the written residual functional capacity determination, the ALJ's references to Dr. Waddell's opinion in the written determination suffice.

### 2.    Opinion Evidence Regarding Plaintiff's Physical Impairments

Plaintiff asserts that the ALJ erred by failing to adequately evaluate the weight assigned to examining opinions from Drs. McGowan and Baker and a reviewing opinion from Dr. McCloud.  SSR 96-6p also governs how the ALJ was to consider opinions from these sources.  1996 WL 374180 at *1.  An ALJ must consider the examining relationship, the treatment relationship, supportability, consistency, and specialization when analyzing opinions from such

sources.  *Id.*  But analyses of opinions from these sources need not be as detailed as the analysis of a treating source's opinion.  *Allen*, 2013 WL 5274577 at * 4.  There is no requirement that an ALJ specifically label the amount of weight given to examining and reviewing opinions, nor is there a "good-reason" requirement for such opinions.  *See Smith*, 482 F.3d 876.

### a.  Drs. Baker and McCloud: Exertional Limitations

Dr. Baker[2] opined that Plaintiff could not lift more than ten pounds; could not sit, stand, or walk for more than thirty minutes; and had difficulties completing activities of daily living. (R. at 202.)  In contrast, state-agency reviewer Dr. McCloud opined that Plaintiff could occasionally lift or carry up to 50 pounds, frequently lift or carry up to 20 pounds, and stand, walk, or sit for about six hours in an eight-hour work day.  (R. at 220.)  Dr. McCloud noted that his restrictions were less limiting than those opined by Dr. Baker, but concluded that Dr. Baker's restrictions were not supported by Plaintiff's statements and the physical done at OSU by Dr. Goodman in January of 2010.  (*Id.*)

Although the ALJ did not discuss Dr. Baker's exertional restrictions, he discussed and discounted Dr. McCloud's less limiting exertional restrictions.  The ALJ wrote:

> [Dr. McCloud] found that exertionally, the claimant can lift and carry at least 50 pounds occasionally and 25 pounds frequently. He can stand/walk for about six hours in an eight hour workday and he can sit for about six hours in an eight hour workday. He has an unlimited ability to push and pull, other than as shown for lifting and carrying [citation to Dr. McCloud's report]. This opinion is given some weight but I note that claimant's own testimony was that his ability to walk, stand, push, pull, reach, sit carry, climb stairs, and use his hands for fine and gross manipulation were all within normal limits.

(R. at 15.)  Substantial evidence supports this conclusion.  Plaintiff testified that he had "no particular problems" with sitting, standing, walking, lifting, and carrying.  (R. at 53.) Moreover, Plaintiff testified that he cooked and cleaned for himself and his Mother, washed

---

[2] Plaintiff states that Dr. Baker was an examining physician who assessed Plaintiff for purposes of deferring his student loans.  (Pl's Statement of Errors 14, ECF No. 10.)

dishes, did laundry, grocery shopped, did lawn work the summer before the hearing, and attended church.  (R. at 55–56.)  Plaintiff also told doctors at OSU that he was doing "a lot of involved dancing," performing in a show, and planning to travel out of town to perform in the show again.  (R. at 270, 273, 268.)  The ALJ thus did not commit reversible error by discounting Dr. McCloud's exertional restrictions.  Nor did he commit reversible error by failing to explicitly weigh Dr. Baker's opinion.  By discounting Dr. McCloud's less limiting exertional restrictions, the ALJ indicated that Dr. Baker's more limiting exertional restrictions would be discounted.

### b.    Drs. McGowan and McCloud: Visual and Environmental Limitations

The ALJ specifically referred to the examination findings in Dr. McGowan's report, writing that Plaintiff's "best corrected distance vision is 20/300 on the right and 20/30 on the left. Best corrected near vision is unknown on the right and 20/800 on the left."  (R. at 15.)

Dr. McCloud adopted Dr. McGowan's examination findings, and found that Plaintiff had visual and environmental limitations.  Specifically, Dr. McCloud opined that based upon Dr. McGowan's examination, Plaintiff's near acuity, far acuity, and depth perception were limited. (R. at 222.)  Dr. McCloud also concluded that Plaintiff's vision was, however, sufficient for occasional reading and very fine, precise work or prolonged visual work.  (*Id.*)  Dr. McCloud further opined that Plaintiff should avoid concentrated exposure to hazards, hazardous machinery, and commercial driving.  (R. at 223.)

Again, the ALJ did not set forth Dr. McCloud's visual and environmental limitations in his written residual functional capacity determination.  (R. at 13.)  But the ALJ included them in the hypothetical question that he posed to the VE.  (R. at 62, 213.)   Indeed, the ALJ stated that the VE should consider all the capabilities and limitations contained in Dr. McCloud's report.

(R. at 61.)   The ALJ then relied upon that VE testimony to reach a non-disability determination. (R. at 16.)  The ALJ thus adopted Dr. McCloud's opinion as to Plaintiff's visual and environmental limitations.  Substantial evidence supports this determination.  Plaintiff testified that with his contact, he could see well enough to read print.  (R. at 48–49.)  He also told the ALJ that he had a driver's license and was permitted to do daytime driving.  The record thus supports the ALJ's use of the light visual and environmental restrictions contained in Dr. McCloud's report when questioning the VE.  Although it would have been clearer if the ALJ had recited those restrictions in the written residual functional capacity determination, the ALJ's discussion of the opinions offered by Drs. McGowan and McCloud was sufficient.

**B.      The ALJ Properly Relied Upon VE Testimony**

Plaintiff asserts that ALJ improperly relied upon VE testimony because the restrictions in the ALJ's written residual functional capacity determination are different from the restrictions in the hypothetical question posed to the VE.  As noted above, the ALJ set forth capacity findings from Section I of Dr. Waddell's report in the written determination.  The ALJ nevertheless used the work-related restrictions in Section III of Dr. Waddell's report and restrictions in Dr. McCloud's report when questioning the VE.  An ALJ may rely upon testimony from a VE when a hypothetical question accurately portrays a claimant's physical and mental impairments.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  Here, the question to the VE included all of the restrictions that the ALJ found credible even though the ALJ failed to set them forth in the written determination.  The ALJ thus did not commit reversible error by relying upon the VE's testimony.

C.      **The ALJ Adequately Developed the Record**

Plaintiff contends that the ALJ failed to fully develop the record at the hearing where Plaintiff appeared *pro se*.  Specifically, Plaintiff asserts that the ALJ failed to ask "functionally determinative questions" with regard to Plaintiff's physical capacities.  (Pl's Statement of Errors 16, ECF No. 10.)  The Court disagrees.

When a Plaintiff is unrepresented by counsel at a hearing, an ALJ has a heightened duty to "scrupulously probe into, inquire of, and explore for all the relevant facts."  *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1983).  There is no bright line test for determining when an ALJ has failed to meet this obligation; courts make that determination on a case by case basis.  *Id.*  Courts have, nevertheless, indicated that an ALJ fails to fulfill this duty if he or she superficially questions an inarticulate Plaintiff with limited intelligence who is easily confused.  *Id.* (explaining that an ALJ must be especially probing when questioning an inarticulate Plaintiff who proceeds *pro se*).

In this case, the ALJ noted that Plaintiff was pleasant and articulate at the hearing.  (R. at 15.)  In addition, Plaintiff testified that he finished a year and a half of college and obtained a certificate in telecommunications.  (R. at  44.)  Dr. Tanley opined that Plaintiff was of low average intelligence, but not below average.  (R. at 204.)  The ALJ also spent considerable time questioning Plaintiff about his activities of daily living and allowed the VE to ask Plaintiff questions about his past work.  (R. at 52–57, 58–59.)  A review of the transcript confirms that Plaintiff's answers to these questions were coherent and unconfused.  (*Id.*) Accordingly, Plaintiff is unlike the type of Plaintiff about which courts have expressed heightened concern.  *Lashley*, 708 F.2d at 1048 (expressing heightened concern for a plaintiff with limited intelligence as opposed to a plaintiff who is not uneducated, ignorant, or timid.)  Moreover, the ALJ explained

to Plaintiff that he had the right to be represented and warned Plaintiff that counsel would be most beneficial to him before an adverse ruling.  (R. at 38–40.)  On these facts, the Court cannot conclude that the ALJ failed to satisfy his duty to ensure that a full and fair record was developed even though Plaintiff appeared at the hearing *pro se*.

## VII.   DISPOSITION

For the reasons set forth herein, Plaintiff's Statement of Specific Errors is **OVERRULED** and that the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**


Date: August 8, 2014                              ____/s/ *Elizabeth A. Preston Deavers*
                                                          Elizabeth A. Preston Deavers
                                                          United States Magistrate Judge